UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BOB MCINTOSH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:01CV65 RWS |
| | ) | |
| MONSANTO CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM AND ORDER

This matter is before me on Monsanto's motions for summary judgment and to exclude the expert testimony of Dr. Robert Tollison. As stated below, the motions will be denied.

## Standards Governing Summary Judgment

In determining whether summary judgment should issue, I must view the facts and inferences from the facts in the light most favorable to the non-moving party, here plaintiffs. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the non-moving party cannot rest on the

allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. Under these standards, I review the facts in this case.

## **Background Facts**

Plaintiffs are farmers who purchased and planted genetically modified Roundup Ready soybean seed (RRSB). In Counts I and III of the third amended complaint, plaintiffs allege that Monsanto conspired with Pioneer and Syngenta[1] to raise, fix and stabilize the price of RRSB in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. RRSB includes patented technology owned by Monsanto. These patents include the exclusive right to make and sell RRSB. In 1992, Monsanto licensed the right to make and sell RRSB to Pioneer for $450,000. The next year, Monsanto licensed the right to Syngenta. The parties refer to these licenses as "paid-up" licenses. Since then, Monsanto has licensed RRSB to more than 200 other seed companies. However, these licenses require the users of RRSB to enter into a Grower License Agreement (GLA) with Monsanto. These licenses also require the licensee seed company to either collect

---

[1] Pioneer and Syngenta were named as defendants in this case but were dismissed after reaching a settlement with the plaintiffs.

a technology fee (set by Monsanto) from the user for each bag of RRSB or pay Monsanto a royalty (again set by Monsanto) for each bag sold. The "paid-up" licenses do not require Pioneer and Syngenta to collect technology fees or pay a royalty.

RRSB came on the market for crop year 1996. Between 1995 and 1999, Monsanto met with Pioneer and Syngenta about renegotiating the "paid-up" licenses. These negotiations form the basis of plaintiffs' claim that Monsanto conspired to eliminate competition in the RRSB market. A Monsanto executive summarized:

> Pioneer had a paid-up license. And Pioneer, under the terms of that agreement, they were free to price the Roundup Ready trait whatever they wanted to. So we were looking at two people or two entities pricing Monsanto Roundup Ready trait into the marketplace. And if Pioneer was pricing it as they wished, and Monsanto was pricing it as they saw fit, there was a potential that the two could compete away the price. (Joehl Dep. at 89-90).

Plaintiffs contend that Monsanto used similar reasoning with Syngenta's "paid up" license. An internal Monsanto study projected that competition in the marketplace (which included Pioneer and Syngenta) would cause any Monsanto premium for RRSB to be "competed away over time." This document predicts that any premium for RRSB would "fall due to competition among seed companies" from a projected $4.00 in 1996 to merely $1 by 1998 and $0 by 1999. It is for this reason, plaintiffs contend, that Monsanto began soliciting Pioneer and Syngenta to fix the

price of RRSB by charging premiums even though not required to do so under the terms of their "paid-up" licenses.

In opposition to summary judgment, plaintiffs have produced numerous documents -- including internal memoranda, e-mails and notes of Monsanto executives -- which demonstrate that Monsanto actively pursued Pioneer and Syngenta for the purpose of soliciting them to sign new license agreements. Plaintiffs' summary of key documents appears at pages 16 through 21 of their memorandum in opposition to summary judgment. Additional evidence is found in the record.[2] Plaintiffs contend that Monsanto reported an agreement with Pioneer in 1996 and Syngenta in 1997, and that these companies began incorporating premiums into their RRSB as a result. Plaintiffs argue that this agreement amounts to a conspiracy to fix, stabilize and maintain the price of RRSB in violation of the Sherman Act.

Monsanto does not deny that it asked Pioneer and Syngenta to renegotiate

---

[2]Plaintiffs initially opposed summary judgment with an affidavit by one of their attorneys who claimed that Monsanto was deliberately withholding documents evidencing the alleged price-fixing conspiracy. Plaintiffs subsequently withdrew this affidavit on the ground that Monsanto has now produced the remaining documents. Although plaintiffs claim that these documents provide additional evidence of a price-fixing conspiracy, they did not provide them to the Court for review. Nevertheless, these documents are not material to my resolution of the summary judgment motion because I find that plaintiffs are entitled to go to trial on the basis of the record currently before me.

their "paid-up" licenses in favor of the standard GLA, but it contends that its efforts were unsuccessful. Moreover, Monsanto maintains that these negotiations do not amount to a price-fixing conspiracy because the companies still competed on the price of RRSB by offering free seed, other products, discounts, services and other items of value.

In Count II of the third amended complaint, plaintiffs allege that Monsanto attempted to artificially restrict competition in the RRSB market by entering into an anti-competitive agreement with Aventis to restrict the amount of Liberty Link soybean seeds in the marketplace. Plaintiffs contend that this agreement amounts to an "output restriction" which is illegal per se under Section 1 of the Sherman Act. Monsanto contends that this claim fails as a matter of law because the limitation was imposed pursuant to a 1996 settlement, license and distribution agreement between the parties. As reflected in that agreement, Aventis[3] wanted to make and sell Liberty Link soybean seed, but needed the right to use Monsanto's patented "35S" promoter to do so. Therefore, Monsanto licensed the right to use the gene to Aventis, subject to certain restrictions -- including a limitation on production -- on the use of its patent. Because the limitation on production was negotiated in connection with a patent licensing agreement, Monsanto contends

---

[3]Actually, the agreement was between Monsanto and Aventis's predecessor, AgrEvo.

that it does not amount to an illegal "output restriction" as a matter of law.

## Discussion

Section 1 of the Sherman Act prohibits concerted action by two or more parties in restraint of trade. 15 U.S.C. § 1. To prevail on a Section 1 case, plaintiffs must prove that: 1) there was an agreement among Monsanto, Pioneer and Syngenta in restraint of trade; 2) plaintiffs were injured as a direct and proximate result; and 3) plaintiffs' damages are capable of ascertainment and are not speculative. See St. Louis Convention & Visitors Comm'n v. National Football League, 154 F.3d 851, 861 (8th Cir. 1998). In two cases, Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986), the United States Supreme Court established the standard used to determine whether plaintiffs' evidence of a Section 1 violation survives summary judgment. To state a Section 1 case and withstand summary judgment, plaintiffs must present evidence that "tends to exclude the possibility of independent action" by Monsanto, Pioneer and Syngenta. Spray-Rite, 465 U.S. at 768. This means that conduct that is "as consistent with permissible [activity] as with illegal does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588.

Having reviewed the voluminous record in this case in light of the rigorous

standard of proof that applies in antitrust cases, I find that plaintiffs have presented sufficient evidence to withstand summary judgment on Counts I and III of the third amended complaint. The evidence, when viewed in the light most favorable to plaintiffs, could support a jury finding that Monsanto, Pioneer and Syngenta conspired to raise, fix and stabilize prices in the Roundup Ready soybean seed market. Whether Monsanto's efforts to renegotiate the Pioneer and Syngenta "paid up" licenses amounted to an illegal conspiracy to fix the price of RRSB is hotly contested, and resolution of this disputed issue will depend upon factual findings and credibility determinations that cannot be made by me on summary judgment. I cannot predict whether plaintiffs will succeed at trial. However, they must be afforded an opportunity to fully and finally adjudicate these claims.

Summary judgment must also be denied on Count II of the third amended complaint because Monsanto has failed to demonstrate that it is entitled to judgment as a matter of law. Monsanto asserts that, as the owner of the patent for the "35S" promoter, it "had the right to either not license this gene to AgroEvo at all, or to license it on whatever terms it deemed reasonable, including limiting the amount of Liberty Link soybeans AgrEvo could use the gene to make." (Mem. Supp. Summ. J. at 21). This argument is insufficient to demonstrate that Monsanto is entitled to judgment as a matter of law because patent holders can,

under certain circumstances, be liable for antitrust violations in connection with the scope of licensing agreements. See In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 532 (D.N.J. 2004); In re Ciprofloxacin Hydrochloride Antritrust Litig., 166 F. Supp. 2d 740, 749 (E.D.N.Y. 2001). Therefore, Monsanto's argument that its conduct is exempt from antitrust liability merely because it owns the "35S" promoter patent does not necessarily demonstrate that it is entitled to judgment as a matter of law. While I believe that Monsanto may ultimately be able to demonstrate that its agreement with Aventis is permissible under the Sherman Act, see Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135 (1969) ("Simply stated, a patent holder is permitted to maintain his patent monopoly through conduct permissible under the patent laws."), I cannot make that determination today in light of the arguments of the parties and the record before me. However, given the existence of Monsanto's "35S" promoter patent and plaintiffs' failure to address this issue on summary judgment, I urge plaintiffs to review the evidence thoroughly before proceeding to trial on this claim.

Monsanto also argues that plaintiff CK-Farms must be dismissed as a party to this action because it is an "indirect purchaser" and accordingly lacks standing to pursue federal antitrust claims. In Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), the Supreme Court held that only the "direct purchaser" from a monopoly supplier could sue for treble damages under § 4 of the Clayton Act. See §15

U.S.C. 15. "Indirect purchasers" generally lack standing under the antitrust laws and so cannot bring suits for damages. See Campos v. Ticketmaster Corp., 140 F.3d 1166, 1169 (8th Cir. 1998). The Supreme Court has defined an indirect purchaser as one who is not the "immediate buyer from the alleged antitrust violator[ ]," Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 207 (1990), or one who "[does] not purchase [the monopolized product] directly from the [antitrust] defendant[.]" California v. ARC America Corp., 490 U.S. 93, 97 (1989).

Monsanto raised this issue once before on summary judgment. In my Memorandum and Order of September 19, 2003 denying Monsanto's motion, I held that genuine disputes of material fact remained regarding the issue of whether C-K Farms was an indirect purchaser. At that time, plaintiffs had presented evidence that C-K Farms is a direct purchaser because: 1) it remits the technology fee (without which C-K Farms cannot purchase the RRSB seed) to Monsanto; and 2) the farmer-dealers who sell the soybean seed and collect the technology fee act as agents of Monsanto for purposes of this analysis.

On appeal, the Eighth Circuit Court of Appeals affirmed my ruling on this issue as follows:

> The district court, in its order of September 19, 2003, denying summary judgment, left the question unresolved. The specific instance then before the district court concerned a farmer who bought GM seed from an independent dealer licensed by Monsanto, was

> separately invoiced for the technology fee, and paid it to the dealer, who remitted it to Monsanto. The farmer then separately obtained a license directly from Monsanto to plant the seed (i.e., to use the patented gene to grow a commercial crop). As to this particular case, we agree with the district court's apparent conclusion that this transaction is functionally indistinguishable from a direct purchase of both the seed and the license from an agent of Monsanto.

Blades v. Monsanto Co., 400 F.3d 562, 568 n.4 (8th Cir. 2005).

Monsanto has not presented any additional evidence in the instant motion that contradicts the undisputed facts as presented in connection with the first motion for summary judgment or as found by the Eighth Circuit on appeal. As such, I conclude that C-K Farms is a direct purchaser with standing to pursue antitrust claims because the transaction by which it purchased RRSB seed and the corresponding license "is functionally indistinguishable from a direct purchase of both the seed and the license from an agent of Monsanto." Id. Summary judgment will therefore be denied.

## Motion in Limine

Monsanto also seeks to exclude plaintiffs' expert witness, Robert Tollison, Ph.D., from testifying at trial on the grounds that his opinions are unreliable and his methodology is deficient. Because Tollison's testimony is reliable and relevant, the motion will be denied.

Testimony by a qualified expert that bears on "scientific, technical, or other specialized knowledge" and "will assist the trier of fact to understand the evidence

or to determine a fact in issue" is admissible under Rule 702 if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. This rule imposes a gatekeeping responsibility on the district court to consider the reliability of the evidence before determining that it is admissible. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). "Daubert provides a district court with the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of fact." Robinson v. GEICO General Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006). "A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Id. (internal citations and quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 595.

To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. Daubert, 509 U.S. at 589-90. To show that the expert testimony is relevant, the proponent must show that the reasoning or methodology

in question is applied properly to the facts in issue. Id. Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility. Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998); see also Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir. 1991) (noting that Rule 702 "is one of admissibility rather than exclusion"). However, a court should not admit opinion evidence that "is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). When the analytical gap between the data and proffered opinion is too great, the opinion must be excluded. Id.

Attacking Tollison's methodology, Monsanto argues that his opinions regarding the existence of a conspiracy are unreliable because they are imprecise and not supported with sufficient facts or data. Monsanto claims that Tollison improperly relied on its own documents as evidence of a conspiracy and ignored other data relating to the pricing of RRSB. However, my review of the evidence in this case reveals that Tollison does identify the conspiracy and the actions he believe comprise it. Tollison bases his opinions on a review of the documents in this case, application of economic theory and his past experience in the antitrust field. There is no evidence that this type of methodology and data are unreliable or not typically used in this field; indeed, if that were the case, Monsanto's own experts would be subject to exclusion for employing similar methodology.

Monsanto's experts also reviewed Monsanto's documents to determine if a conspiracy existed; they just reached different conclusions about them.  However, this type of disagreement does not render Tollison's opinions unreliable. Monsanto may cross-examine Tollison about the wisdom of relying on certain Monsanto documents to the exclusion of others, but Tollison's opinions are not excludable on this basis.

Nor is Tollison's testimony rendered inadmissible under Rule 702 because he did not perform an extensive quantitative analysis in this case.  Here, Monsanto points to evidence which it believes demonstrates that no conspiracy existed, and claims that Tollison's testimony is unreliable because he does not reach the same conclusions as Monsanto's experts about the RRSB market.  This argument goes to the weight, not the admissibility, of Tollison's testimony, which Monsanto may properly challenge on cross-examination.  I cannot, however, exclude Tollison's testimony merely because Monsanto and its experts disagree with his conclusions.

Monsanto also attacks the reliability of Tollison's opinions by claiming they contradict testimony given in a prior case.  Even if true, inconsistencies in testimony go to its weight, not its admissibility, and are not a basis for excluding Tollison from testifying at trial.

Finally, Monsanto claims that the methodology used by Tollison to calculate plaintiffs' damages is unreliable.  This argument must be rejected

because Tollison applied the standard "but for" pricing model used to estimate damages in antitrust cases. See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000) (to properly calculate damages in antitrust case, an expert is required to construct a hypothetical market, a "but for" market, free of the restraints and conduct alleged to be anticompetitive). To determine the amount of plaintiffs' damages, Tollison compared the actual prices paid for RRSB by the plaintiffs to the "but-for" price, then multiplied the differences by the relevant quantities purchased to estimate plaintiffs' aggregate damages. Monsanto challenges the benchmark price Tollison uses to calculate his "but for" market. This calculation is based upon plaintiffs' theory of the case (that the technology fee or premium amounts to the illegal overcharge) and Monsanto's own internal document projecting how seed premiums in the RRSB market "will fall due to competition among seed companies." I cannot exclude Tollison from trial for his reliance upon Monsanto's own predictions of the "but for" pricing model. Monsanto may challenge the applicability (perhaps even the accuracy) of its document to this case, and Tollison's assumptions with respect to his "but for" pricing model are fodder for cross-examination. However, Tollison's testimony meets the requirements of Rule 702 and is admissible at trial.

    Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [#533] is denied.

**IT IS FURTHER ORDERED** that defendant's motion in limine [#536] is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motions for leave [#551 and #552] are granted.

**IT IS FURTHER ORDERED** that plaintiffs' motion for an early pretrial conference [#571] is denied.  **This case will be set for a pretrial conference if necessary after the parties file their initial pre-trial submissions.**

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 20th day of November, 2006.